ALITO, Circuit Judge,
dissenting:
Was United States v. Lopez, — U.S.-, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), a constitutional freak? Or did it signify that the Commerce Clause still imposes some meaningful limits on congressional power?
The statutory provision challenged in this ease, the portion of 18 U.S.C. § 922(o) that generally prohibits the purely intrastate pos *287 session[1] of a machine gun, is the closest extant relative of the statute struck down in Lopez, 18 U.S.C. § 922(q)(1)(A), which made it a federal offense knowingly to possess a firearm in a school zone. Both are criminal statutes that regulate the purely intrastate possession of firearms. Both statutes, departing from the mold of prior federal criminal statutes governing firearms possession, lack a jurisdictional element,[2] that is, they do not require federal prosecutors to prove that the firearms were possessed in or affecting interstate commerce. Compare, e.g., 18 U.S.C. § 922(d). And in passing both statutes, Congress made no findings regarding the link between the intrastate activity regulated by these laws and interstate commerce. If Lopez does not govern this case, then it may well be a precedent that is strictly limited to its own peculiar circumstances. That may be what the majority here would like, see Maj. Op. at 283 (citation omitted) (“challenges based on Lopez ‘[ajlmost invariably’ fail”), but our responsibility is to apply Supreme Court precedent. That responsibility, it seems to me, requires us to invalidate the statutory provision at issue here in its present form.
This would not preclude adequate regulation of the private possession of- machine guns. Needless to say, the Commerce Clause does not prevent the states from regulating machine gun possession, as all of the jurisdictions within our circuit have done. See Del.Code Ann. tit. 11, § 1444 (1995); N.J.Stat.Ann. § 2C:39-5a (West 1995); 18 Pa.Cons.Stat.Ann. § 908 (1996); V.I.Code Ann. tit. 14, § 2253 (1994). Moreover, the statute challenged here would satisfy the demands of the Commerce Clause if Congress simply added a jurisdictional element — a common feature of federal laws in this field and one that has not posed any noticeable problems for federal law enforcement. In addition, as. I explain below, 18 U.S.C. § 922(o) might be sustainable in its current form if Congress' made findings that the purely intrastate possession of machine guns has a substantial effect on interstate commerce or if Congress or the Executive assembled empirical evidence documenting such a link. If, as the government and the majority baldly insist, the purely intrastate possession of machine guns has such an effect, these steps are not too much to demand to protect our system of constitutional federalism.
I.
In Lopez, the Supreme Court identified “three broad categories” of legislation permitted under the Commerce Clause: (1) regulation of “the use of the channels of interstate commerce,” (2) regulation and protection of “the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities,” and (3) regulation of “activities that substantially affect interstate commerce.”[3]
— U.S. at -— --, 115 S.Ct. at 1629-30.
The majority in this case quite properly focuses its analysis primarily on the third of *288 these categories — Congress’s power to regulate those “activities that substantially affect interstate commerce” — because this is plainly the category under which 18 U.S.C. § 922(o) must be analyzed. But panels in the Fifth, Sixth, Ninth, and Tenth Circuits have tried to shoehorn 18 U.S.C § 922(o) into the first or second categories, and the majority cannot bring itself to acknowledge these courts’ errors. Therefore, without embracing or repudiating the reasoning of these other courts, the majority writes:
Whatever the category relied on, it is telling that each of our sister circuits has found that the regulation of machine gun transfer and possession comes within Congress’ power to legislate under the Commerce Clause. That uniform result confirms the observation made in United States v. Bell, 70 F.3d 495, 497 (7th Cir.1995), that, for criminal defendants, “[i]t appears that United States v. Lopez has raised many false hopes,” and that challenges based on Lopez “[ajlmost invariably” fail.
Maj. Op. at 283. This approach requires me to discuss the first two categories and explain why I believe they are clearly inapplicable here.
II.
Regulation of the channels of commerce. As the majority notes (Maj. Op. at 283), panels in the Fifth, Sixth, and Ninth Circuits have upheld 18 U.S.C. § 922(o) as a regulation of “the use of the channels of interstate commerce.” Lopez, — U.S. at -, 115 S.Ct. at 1629. See United States v. Beuckelaere, 91 F.3d 781, 783 (6th Cir.1996); United States v. Rambo, 74 F.3d 948, 951-52 (9th Cir.), cert. denied, — U.S.-, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); United States v. Kirk, 70 F.3d 791, 796 (5th Cir.1995), reh’g en banc granted, 78 F.3d 160 (5th Cir.1996). However, these courts seem to me to have fundamentally misunderstood the first category set out in Lopez.
To illustrate the meaning of this category, Lopez quoted a sentence from Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), in which the Court upheld the constitutionality of the so-called White Slave Traffic Act, which prohibited the interstate transportation of women for prostitution or other immoral purposes. The sentence from Caminetti that was partially quoted in Lopez was as follows:
The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.
Lopez, - U.S. at-, 115 S.Ct. at 1629, citing Caminetti, 242 U.S. at 491, 37 S.Ct. at 196-97. Lopez also cited United States v. Darby, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941), where the Court wrote:
Congress, following its own conception of public policy concerning the restrictions which may appropriately be imposed on interstate commerce, is free to exclude from the commerce articles whose use in the states for which they are destined it may conceive to be injurious to the public health, morals, or welfare, even though the state has not sought to regulate their use.
In support of this statement, the Darby Court cited (id.), among other cases, Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) (the “Lottery Case”), which upheld a law prohibiting the interstate shipment of lottery tickets, and Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364 (1911), which sustained a law banning the interstate shipment of adulterated food. Thus, it seems clear that the first category of Commerce Clause authority outlined in Lopez concerns Congress’s power to regulate, for economic or social purposes, the *289 passage in interstate commerce of either people or goods.
The statute at issue in this case, 18 U.S.C. § 922(o), would fall within this category if it barred the interstate shipment of machine guns, but of course that is not what it does. Instead, it goes much farther and reaches the wholly intrastate possession of machine guns. I therefore agree with the Seventh Circuit, which, while sustaining 18 U.S.C. § 922(o) under the third Lopez category, candidly acknowledged that it did not fall within the first. United States v. Kenney, 91 F.3d 884, 889 (7th Cir.1996); see also Beuckelaere, 91 F.3d at 787-88 (Suhrheinrich, J., dissenting); Kirk, 70 F.3d at 799 (Jones, J., dissenting).
In holding that 18 U.S.C. § 922(o) falls within the first category, the Fifth, Sixth, and Ninth Circuits reasoned chiefly as follows. This statute, while generally banning the private possession of machine guns, does not apply to machine guns lawfully possessed prior to its enactment in 1986. See 18 U.S.C. § 922(o)(2)(B). Therefore, “there could be no unlawful possession under section 922(o) without an unlawful transfer.” Kirk, 70 F.3d at 796. Accordingly, “the limited ban on possession of maehineguns must be seen as a necessary and proper measure meant to allow law enforcement to detect illegal transfers where the banned commodity has come to rest: in the receiver’s possession. In effect, the ban on such possession is an attempt to control the interstate market for maehineguns by creating criminal liability for those who would constitute the demand-side of the market, i.e., those who would facilitate illegal transfer out of desire to acquire mere possession.” Id.; see also Beuckelaere, 91 F.3d at 783; Rambo, 74 F.3d at 951-52.
There are numerous flaws in this analysis. First (but least important), it is not true that every possession criminalized by 18 U.S.C. § 922(o) must be preceded by an “unlawful transfer.” A lawfully possessed semiautomatic weapon could be converted by its owner into an automatic. See Kenney, 91 F.3d at 889. The statute may also reach a person who initially possesses a machine gun lawfully pursuant to 18 U.S.C. § 922(o)(2)(A), which permits possession under governmental authority, but who exceeds the scope of that authority or retains possession after it has terminated. Second and more important, this reasoning seems to confuse an unlawful transfer with an interstate transfer. Even if it were true that every possession made illegal by 18 U.S.C. § 922(o) were preceded by an unlawful transfer, it would not follow that every such possession is preceded by an interstate transfer, and Congress’s authority under the first Lopez category concerns the passage of people and goods in the channels of interstate commerce. Third, insofar as the Fifth, Sixth, and Ninth Circuits justified 18 U.S.C § 922(o) as an attempt to suppress an interstate market by banning purely intrastate possession, their arguments fall within the third Lopez category, ie., Congress’s authority to regulate an intrastate activity (intrastate possession) that has a substantial effect on interstate commerce (the interstate market). The Seventh Circuit recognized this point when it wrote:
[Although it may be true that Congress must regulate intrastate transfers and even mere possessions of machine guns in aid of its prerogative of preventing the misuse of the channels of interstate commerce, the regulation still regulates much more than the channels of commerce. This rationale is therefore an aspect of Congress’s broader power to regulate things “affecting” interstate commerce; we must look further, in light of Lopez, to confirm the existence of a rational and substantial basis underlying its power to do so.
Kenney, 91 F.3d at 889.
III.
Regulation of activities that threaten the instrumentalities of interstate commerce or persons or things in interstate commerce. In Lopez, the Court wrote that “Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.” — U.S. at-, 115 S.Ct at 1629. The Court cited two cases involving the exercise of this power. The first, Houston, E. & W. Tex. Ry. v. United *290 States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), (the “Shreveport Rate Cases”) in which the Court upheld the regulation of intrastate railroad rates on the theory that this regulation was needed to protect “the security of [interstate] traffic,” “the efficiency of the interstate service,” and “the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance.” Id. at 351, 34 S.Ct. at 836. The second Southern Ry. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911), upheld federal safety regulations as applied to trains and railroad cars travelling intrastate on a railroad line that was a highway of interstate commerce. The Court reasoned that the “absence of appropriate safety appliances” from the intrastate trains and cars was “a menace,” not only to those trains and cars, but also to those moving in interstate commerce. Id. at 27, 32 S.Ct. at 4. See United States v. Bishop, 66 F.3d 569, 597-98 (3d Cir.1995)(Becker, J., concurring in part and dissenting in part).
In addition to these two cases, the Lopez Court cited two statutes that had been listed in Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359-60, 28 L.Ed.2d 686 (1971), as falling within this category of congressional authority. See Lopez, — U.S. at -, 115 S.Ct. at 1629. The statutes were 18 U.S.C § 32, which, at the time of Perez, made it a crime to damage or destroy an aircraft that was used in interstate commerce, and 18 U.S.C. § 659, which criminalizes thefts from interstate shipments.
Based on the Lopez Court’s description of this second category of congressional authority and on the examples that it provided, it is apparent that this authority reaches threats to “the instrumentalities” of interstate commerce, i.e., the means of conveying people and goods across state lines, such as airplanes and trains. This power also reaches threats to people and goods travelling in interstate commerce, such the theft of goods moving interstate and the setting of rates that could affect interstate trade.
Title 18 U.S.C. § 922(o) would fall within this second Lopez category if Congress had banned the intrastate possession of machine guns in order to prevent them from being used to damage vehicles travelling interstate, to carry out robberies of goods moving in interstate commerce, or to threaten or harm interstate travellers. However, there is no indication that Congress passed 18 U.S.C. § 922(o) for any of these reasons; and neither the government, the majority in this case, nor any of the other courts of appeals have adduced any evidence that this statute is needed for any of these purposes. Thus, I agree with the Seventh Circuit that 18 U.S.C § 922(o) “appears to be an ill fit in the second” Lopez category. Kenney, 91 F.3d at 889.
Although the Sixth and Tenth Circuits upheld 18 U.S.C. § 922(o) under this second category, I find their reasoning elusive. Both courts stressed that machine guns travel in interstate commerce. See Beuckelaere, 91 F.3d at 784 (“Machineguns travel in interstate commerce, posing a threat to local law enforcement, which has a disruptive effect on interstate commerce.”); United States v. Wilks, 58 F.3d 1518, 1521 (10th Cir.1995) (“machineguns ... by their nature are ‘a commodity ... transferred across state lines for profit by business entities’ ”)(“[t]he interstate flow of machineguns ... is interstate commerce”). But how these assertions show that 18 U.S.C § 922(o) can be sustained under the second Lopez category, I am at a loss to understand. Those machine guns that are actually travelling in interstate commerce may be regulated under the first Lopez category, i.e., Congress may ban them from the channels of interstate commerce altogether or restrict their admission. However, machine guns that are simply possessed intrastate and are not travelling in interstate commerce may not be regulated under the first Lopez category, and as previously explained, unless they are menacing interstate commerce, they do not fall within the second category either.
Accordingly, I think it is clear that “if [18 U.S.C. § 922(o)] is to be sustained,” it cannot be under the first or second Lopez categories, but “must be under the third category as a regulation of an activity that substantially affects interstate commerce.” Lopez, — U.S. at-, 115 S.Ct. at 1630.
*291 IV.
Regulation of activities that substantially affect interstate commerce. I come now to the crux of this case, viz., whether 18 U.S.C. § 922(o) can be upheld in its present form and on the present record on the ground that the purely intrastate possession of machine guns substantially affects interstate commerce. As I understand its opinion, the majority advances two separate theories, and I will address each separately.
A. The majority writes:
Just as the Court in Wickard [v. Filburnn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, 125 (1942),] sustained the regulation of wheat intended wholly for home consumption because it was connected to an overall interstate market which it could depress, 317 U.S. at 128-29 [63 S.Ct. at 90-91], and the Court in Perez [v. United States, 402 U.S. 146, 156, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971),] sustained the regulation of purely intrastate loansharking because in the aggregate such local loansharking substantially affected interstate commerce, 402 U.S. at 155-57 [91 S.Ct. at 1362-63], so also § 922(o) can be sustained because it targets the possession of machine guns as a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns.
Maj. Op. at 281-82. In other words, the majority argues in effect that the private, purely intrastate possession of machine guns has a substantial effect on the interstate machine gun market.
This theory, if accepted, would go far toward converting Congress’s authority to regulate interstate commerce into “a plenary police power.” Lopez, -U.S. at-, 115 S.Ct. at 1633. If there is any sort of interstate market for a commodity — and I think that it is safe to assume that there is some sort of interstate market for practically everything — then the purely intrastate possession of that item will have an effect on that market, and outlawing private possession of the item will presumably have a substantial effect. Consequently, the majority’s theory leads to the conclusion that Congress may ban the purely intrastate possession of just about anything. But if Lopez means anything, it is that Congress’s power under the Commerce Clause must have some limits. Cf. Charles Fried, Foreword: Revolutions?, 109 Harv.L.Rev. 13, 36-37 (1995).
The Lopez Court of course recognized the potential sweep of Wickard, on which the majority’s theory is chiefly based, and the Lopez Court sought to place reasonable limits on that theory. Observing that Wickard represents “perhaps the most far reaching example of Commerce Clause authority over interstate activity,” the Court noted that Wickard “involved economic activity in a way that the possession of a gun in a school zone does not.” — U.S. at -, 115 S.Ct. at 1630. The Court then added:
Section 922(q) is a criminal statute that by its terms has nothing to do with ‘commerce’ or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.
— U.S. at---, 115 S.Ct. at 1630-31 (footnote omitted).
The activity that the Lopez Court found was not “economic” or “connected with a commercial transaction” was a type of intrastate firearm possession, i.e., the possession of a firearm (including a machine gun) within a school zone. At issue here is another type of purely intrastate firearm possession, i.e., the purely intrastate possession of a machine gun. If the former must be regarded as non-economic and non-commercial, why isn’t the same true of the latter? Is possession of a machine gun inherently more “economic” or more “commercial” than possession of other firearms?[4] Is the possession of a firearm within a school zone somehow less “eeonom *292 ie” and “commercial” than possession elsewhere — say, on one’s own property?[5] If there are distinctions of constitutional dimension here, they are too subtle for me to grasp. It seems to me that the most natural reading of Lopez is that the simple possession of a firearm, without more, is not “economic” or “commercial” activity in the same sense as the production of wheat in Wickard and that therefore such possession cannot be regulated under the Wickard theory. Cf. United States v. Bishop, 66 F.3d at 601-02 (Becker, J., concurring in part and dissenting in part).
B. The majority’s second theory appears to be that Congress could have rationally concluded that the purely intrastate possession of machine guns increases the incidence of certain crimes — the majority specifically mentions violent crime, racketeering, and drug trafficking — that are of “national concern.” See Maj. Op. at 280-81. In order to bring this case within the third Lopez category, it is not enough to observe that violent criminals, racketeers, and drug traffickers occasionally use machine guns in committing their crimes and that these crimes have interstate effects. Rather, there must be a reasonable basis for concluding that the regulated activity (the purely intrastate possession of machine guns) facilitates the commission of these crimes to such a degree as to have a substantial effect on interstate commerce.
I take this theory very seriously, but my problem with it is that it rests on an empirical proposition for which neither Congress, the Executive (in the form of the government lawyers who briefed and argued this case), nor the majority has adduced any appreciable empirical proof.
I would view this case differently if Congress as a whole or even one of the responsible congressional committees had made a finding that intrastate machine gun possession, by facilitating the commission of certain crimes, has a substantial effect on interstate commerce. But despite the resources at their command to investigate questions such as this, neither Congress nor any of its committees did so, and indeed Congress never even identified the source of constitutional authority under which 18 U.S.C. § 922(o) was enacted. Of course, Congress is not obligated to make findings. “But to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.” Lopez, — U.S. at-, 115 S.Ct. at 1632.
Likewise, the Justice Department, which has been litigating the constitutionality of 18 U.S.C. § 922(o) in courts across the country, has not brought to our attention any studies or reports by federal law enforcement agencies or others that establish that the purely intrastate possession of machine guns has a substantial effect on interstate commerce.
Without assistance from Congress or the Executive, the majority has combed the legislative history of federal firearms legislation going back more than a half century, but in my view the majority has not found anything of significant value for present purposes. The majority cites congressional findings made in connection with prior firearms legislation concerning the problems resulting from the interstate movement of firearms. See Maj. Op. at 279 (emphasis added) (findings that “link both the flow of firearms across state lines and their consequential indiscriminate availability with the resulting violent criminal acts that are beyond the effective control of the states”); Maj. Op. at 279 (emphasis added) (“findings of an extensive interstate commerce in firearms and the need for adequate federal control over such *293 traffic”); Maj. Op. at 280 (emphasis added)(findings emphasizing “the connection between the increasing rate of crime, the growing use of firearms, and interstate firearms traffic)”; Maj. Op. at 281 (connection between “the interstate flow of firearms [and] the increasing serious crime in this country”). However, the question here is not whether the interstate flow of firearms substantially affects interstate commerce; rather, the question is whether the entirely intrastate possession of machine guns has such an effect, and none of the findings noted above speak to that question. Indeed, Congress had no occasion to consider that question when it made those findings, since none of the laws in connection with which those findings were made reached purely intrastate possession without requiring proof in court of a jurisdictional link.
The remaining underpinnings of the majority’s analysis are three snippets from a committee report and one comment made on the floor of the Senate. The committee report, H.R.Rep. No. 495, 99th Cong., 2d Sess. (1986), reprinted in 1986 U.S.C.C.A.N. 1327, concerned a bill, H.R. 4332, 99th Cong., 2d Sess. (1986), that lacked any provision similar to 18 U.S.C. § 922(o). Instead, H.R. 4332 dealt with machine guns by providing (sec. 11) for enhanced penalties for defendants who used or carried a machine gun during and in relation to a federal drug trafficking offense or a federal crime of violence. See 18 U.S.C. § 924(c). This provision did not raise any new Commerce Clause problems, because the statutes creating the underlying federal drug trafficking offenses or crimes of violence had presumably been enacted pursuant to one of the federal government’s delegated powers (whether the Commerce Clause or some other provision). Accordingly, the committee had no need to consider the general question of the relationship between machine guns and interstate commerce, much less the specific question of the relationship between intrastate machine gun possession and interstate commerce, and there is no indication that the committee explored either of these topics.
Not surprisingly, however, since H.R. 4332 provided for enhanced penalties in certain cases involving machine gun use, the committee did mention machine guns, and it is upon these fleeting references that the majority relies. The first reference, which appears in a portion of the report captioned “BENEFITS FOR LAW ENFORCEMENT” simply summarizes the enhanced penalty provision. H.R. Rep. 495, supra, at 2, 1986 U.S.C.C.A.N. at 1328. This statement obviously has nothing to do with interstate commerce.
The next reference concerns another bill, H.R. 3155, 99th Cong., 1st Sess. (1985), entitled the “Racketeer Weapons and Violent Crime Control Act of 1985,” that contained a provision (see. 3(b)) very much like 18 U.S.C. § 922(o). The report states that this bill would have “prohibited the transfer and possession of machine guns used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime.” H.R. Rep. 495, supra at 4, 1986 U.S.C.C.A.N. 1330. I do not think that it is reasonable to conclude based on this brief statement that the committee looked into the question and found that there was a substantial link between the conduct prohibited by that bill (the intrastate possession of machine guns) and interstate commerce. After all, the committee did not recommend adoption of the prohibition on intrastate possession contained in H.R. 3155.
The final reference in the committee report concerns “the need for more effective protection of law enforcement officers from the proliferation of machine guns and high-powered ‘assault-type’ weapons that are increasingly being used by criminals.” H.R. Rep. 495, supra at 7, 1986 U.S.C.C.A.N. at 1333. This statement, which lumps together machine guns and assault weapons, says nothing about interstate commerce or particular types of crimes that have substantial interstate effects; and since the committee did not recommend banning the private, intrastate possession of machine guns, the committee presumably felt that the needs of law enforcement would be met by the more limited machine gun provision that it favored. Viewing all three of the statements in the committee report together, I do not think that it is reasonable to conclude that the committee considered or drew any conclusions concerning the relationship between intrastate machine gun possession and interstate commerce.
*294 Nor do I see any value for present purposes in the last bit of congressional material unearthed by the majority, a statement made by Senator Kennedy in a colloquy concerning 18 U.S.C. § 922(o). Voicing opposition to a proposal to “grant amnesty to people who now possess machineguns outside the law,” Senator Kennedy stated: “The only thing that has changed about the machine gun situation since the 1968 act, and the limited amnesty granted then, is that machine guns have become a far more serious law enforcement problem.” 132 Cong. Rec. 9,602 (1986). This observation by a single member of Congress says nothing about interstate commerce or crimes having substantial interstate effects.
In sum, we are left with no congressional findings and no appreciable empirical support for the proposition that the purely intrastate possession of machine guns, by facilitating the commission of certain crimes, has a substantial effect on interstate commerce, and without such support I do not see how the statutory provision at issue here can be sustained — unless, contrary to the lesson that I take from Lopez, the “substantial effects” test is to be drained of all practical significance.[6] As Lopez reminded us, the “constitutionally mandated division of authority [between the federal government and the states] ‘was adopted by the Framers to ensure protection of our fundamental liberties.’ ” Lopez, — U.S. at-, 115 S.Ct. at 1626, quoting Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). See also Lopez, — U.S. at ---, 115 S.Ct. at 1638-39 (Kennedy, J., concurring). And even today, the normative case for federalism remains strong. See Steven G. Calabresi, “A Government of Limited and Enumerated Powers”: In Defense of United States v. Lopez, 94 Mich.L.Rev. 752, 756-790 (1995). Out of respect for this vital element, we should require at least some empirical support before we sustain a novel law that effects “a significant change in the sensitive relation between federal and state criminal jurisdiction.” United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).

. See United. States v. Lopez, 2 F.3d 1342, 1347 (5th Cir.1993), aff'd, — U.S. --, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

. The court wrote:
[W]e have identified three broad categories of activity that Congress may regulate under its commerce power.... First, Congress may regulate the use of the channels of interstate commerce. See, e.g., [United States v. Darby, 312 U.S. 100, 113-15, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256, 85 S.Ct. 348, 357, 13 L.Ed.2d 258 (1964)] (‘[T|he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.') (quoting Caminetti v. United States, 242 U.S. 470, 491, 37 S.Ct. 192, 197, 61 L.Ed. 442 (1917)). Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. See, e.g., Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); Southern R. Co. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911)(upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); [Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d *288 686 (1971)] ("[F]or example, the destruction of an aircraft (18 U.S.C. § 32), or ... thefts from interstate shipments (18 U.S.C. § 659)”). Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, [NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)], i.e., those activities that substantially affect interstate commerce. [Maryland v. Wirtz, 392 U.S. 183, 196 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968).]

. See United States v. Bishop, 66 F.3d at 587 n. 27 ("The dangerousness of the object is not the source of Congressional power; the connection to interstate commerce is.”).

. The majority does not explain why possession of a firearm within a school zone is less "commercial” or "economic" than possession elsewhere— because it plainly is not. (If someone drives through a school zone with a firearm in his possession, does that person quickly cease to engage in a "commercial” activity on entering the zone and then quickly begin on leaving?) Instead, the majority argues that a general ban on the possession of machine guns may reasonably be viewed as having a greater effect on interstate commerce than a ban on the possession of all firearms within certain limited areas (school zones). See Maj. Op. 282. But this argument says nothing about the "commercial" or “noncommercial” character of firearms possession.

. The majority's suggestion (Maj. Op. 281) that my analysis "requires either Congress or the Executive to play Show and Tell with the federal courts" is simply wrong. The Supreme Court has recognized the importance of congressional findings. See, e.g., Lopez, -U.S. at-, 115 S.Ct. at 1632. Indeed, in United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), where the Court construed ambiguous language in a felon-in-possession statute to require proof that the possession was connected with interstate commerce, the Court wrote: "In light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms.” Id. at 339 n. 4, 92 S.Ct. at 517 n. 4.
With respect to the Executive, it is a litigant seeking to persuade us that there is a reasonable case to be made for the proposition that the intrastate possession of machine guns substantially affects interstate commerce. There is nothing improper or unusual about asking a litigant to point to support for its position, whether in the form of evidence in the record or legislative facts that can be judicially noticed. Such assistance would have been particularly valuable here, since the Executive is in a far better position than we are to determine whether there is a reasonable empirical case to be made for the proposition it is advancing. Without congressional findings or empirical support, it is not possible for appellate judges, who are not experts on firearms, machine guns, racketeering, drug trafficking, or crime in general, to verify in any intellectually respectable way that there is a reasonable case to be made for the proposition that the intrastate possession of firearms substantially affects interstate commerce.